NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250511-U

NO. 4-25-0511

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 27, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| KENDALL D. DRUMMOND, | ) | No. 24CF762 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Mark E. Gilles, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court affirmed, concluding defendant had not established any reversible error with respect to the actions of the trial court or his trial counsel.

¶ 2 Following a November 2024 trial, a jury found defendant, Kendall D. Drummond, guilty of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2024)). He was later sentenced to seven years in the Illinois Department of Corrections (DOC). Defendant appeals his conviction, challenging (1) the absence of an instruction to the jury conveying that his decision not to testify could not be held against him and (2) the adequacy of the inquiry into his *pro se* claim of ineffective assistance of trial counsel. For the reasons that follow, we affirm.

¶ 3 I. BACKGROUND

¶ 4 During *voir dire*, the trial court admonished four-person panels regarding the four

*Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472, 477 (1984)), including that defendant was not required to present any evidence and that defendant's failure to testify could not be held against him. The venirepersons in each panel indicated they understood and accepted these principles.

¶ 5        The State called three witnesses: Justice Brown, Mary Brown, and Officer Hunter Willoughby.

¶ 6        Justice testified she was previously in a relationship with defendant and they shared a one-year-old child. On August 3, 2024, Justice, defendant, and their child lived together in a two bedroom apartment. Around 6 a.m. that morning, Justice woke and noticed the front door of the apartment was, unusually, wide open. At the time, the child was staying with Justice's mother, Mary, who lived nearby. Justice called defendant, who had gone out the night before to celebrate a friend's birthday and had not returned home.

¶ 7        Justice described defendant as being "dry with [her]" and "annoyed" while they spoke on the phone. Justice wanted defendant to return home to check out the apartment with her. After calling defendant, Justice called her mother to tell her what had happened.

¶ 8        While Justice was on the phone with her mother, defendant arrived home. Justice testified defendant was standing in the apartment, staring at her, seemingly irritated and asking why the door was wide open. Justice could tell defendant "had been drinking." Mary testified she overheard a man's voice in the background of the phone conversation and recognized it to be defendant's voice.

¶ 9        Justice ended the phone call with her mother. She then explained to defendant how the door was wide open, and she thought their dog's cage had been moved slightly from its place next to the door. Justice testified defendant asked "with attitude" if anything was taken, to which Justice responded by saying she did not really look, but nothing seemed out of the ordinary. In

response, defendant told Justice she told this story to get him to return home.

¶ 10    Justice testified she and defendant argued. She acknowledged her recollection of the events after the argument commenced was limited. Justice testified she called her mother after defendant "was done beating [her]." She also testified she woke up in a hospital. She acknowledged she told police officers she couldn't remember what happened to her.

¶ 11    Mary testified Justice made a second call to her about 30 minutes after the initial call. During this call, Mary could hear only Justice's voice, which she described as scared, frantic, panicked, and upset. Mary testified Justice told her that her face was bloody and two of her teeth were broken. Mary, wondering if Justice was involved in a fight, immediately looked out her window and saw a man, whom she identified as defendant, walking away from the direction of Justice's apartment. Mary did not remember details about defendant's clothing but maintained she knew it was defendant. Mary went to Justice's apartment.

¶ 12    Upon arriving at Justice's apartment, Mary saw Justice, whose face was bloody and who appeared out of it. Mary did not see anyone else outside or inside the apartment. She then took Justice to the hospital.

¶ 13    While at the hospital, Justice was given five stitches above her brow and under her right eye. Justice testified she had a broken nose, broken orbital bone, and cheek. She also testified she lost two front teeth, which required two root canals. Both sides stipulated Justice was diagnosed with an orbital fracture. Justice testified the vision from her right eye was still blurry at the time of trial. Justice also testified she did not have any injuries to her face prior to defendant returning to the apartment on the morning of August 3, 2024.

¶ 14    Justice went to her apartment after leaving the hospital. She described her living room as a mess, with blood trailing from the living room to the bedroom and handprints on the

living room floor. She found her two front teeth in the kitchen.

¶ 15      Officer Willoughby testified he spoke with Justice at the hospital. He described her as dazed and confused during their interaction. He took photographs of Justice, which were shown to the jury. Officer Willoughby then went to Justice's apartment. He took photographs of the apartment, which were also shown to the jury. While inside the apartment, he did not see a dog.

¶ 16      On August 12, 2024, Officer Willoughby spoke with Justice again. Officer Willoughby testified Justice seemed to recall more at that time and had a red mark around her eye.

¶ 17      After eliciting this information, the State rested its case. Defendant's trial counsel then stated he did not believe the defense was going to present any evidence. As the trial court began to confirm this decision, defendant told the court, "We aren't seeing eye to eye." The court asked defendant if he understood that not presenting evidence meant he would not testify, and defendant responded, "No, we're not—no, I don't understand anything. I don't—we're not seeing eye to eye. You—no, no, no, no." When the court clarified it was not asking whether defendant agreed with the decision and only asked if he understood, defendant told the court, "I'm being improperly—improper defended. I'm not—I'm not being defended properly at all." The court asked, "How is that?" Defendant responded, "I never—we never talk. We never—we're not communicating. It's all bad." When asked by the court, "What's the problem?" defendant stated, "I feel like I'm not getting presented the right way." When then asked, "Why?" defendant stated, "Because he's telling me something and I'm hearing something different."

¶ 18      Based upon defendant's statements, the trial court asked defendant if his trial counsel told him his prior conviction would be introduced if he testified, to which defendant indicated counsel "said all that." The court told defendant the advice was correct. The court then asked the State if it intended to admit the conviction, to which the State indicated it did. The court

confirmed the advice was correct.

¶ 19 After the trial court asked if there was another reason defendant felt he was improperly represented, defendant replied, "He—I've tried to tell—we're not communicating on the right page." The court asked, "Whose fault would that be in your view? His or yours?" Defendant replied, "His." When asked what was not communicated to him, defendant told the court, "I never had a chance to, ever, to talk to this man about my—anything in my case. Anything. This whole case, I—the schedule conference hearing, nothing. Didn't talk to me about anything," and, "He didn't break nothing down to me." Defendant further said, on the seventh day of an unspecified month, his counsel came to him with an offer, which he rejected. Defendant said they did not talk about anything else regarding the case, such as whether he had any evidence to present in his defense. At that point, defendant's trial counsel interjected and stated he had asked if defendant had any witnesses and was told no. The court told counsel it was "going to hear [defendant] out," and then it would hear from counsel.

¶ 20 The trial court asked if defendant had any other complaints. Defendant went on to explain that while his trial counsel said he spoke to him on the first court appearance, this was not true and they never talked. Defendant further asserted he did not have a detention hearing on August 28, 2024, to which the court indicated that was factually incorrect, as it presided over the hearing on August 28. Defendant maintained he and his counsel did not talk "[a]t all." The court asked, "Did you tell him that you wish to plead not guilty and have a trial?" Defendant replied, "Yes. No, I did not. I just got indicted." When asked if he conveyed to counsel that he did not want to plead guilty, defendant again asserted, "We never talked." When the court attempted to follow up with another question, defendant interrupted, stating, "We never talked or anything. I just said I want to get a jury trial." At that point, the court admonished defendant to not interrupt it and that

he was about to be found in contempt for not letting the court ask him a question. The court further stated:

> "I'm not asking whether you had lengthy conversations with [counsel], but I'm in this courtroom daily. [Counsel] is [in the courtroom] almost every day and he has enough of a conversation with his clients on a regular basis to know whether or not his client wishes to accept an offer from the State or whether the client wishes to go to trial."

The court then asked, "Did you convey to him that you wished to go to trial?" Defendant responded, "Yes, I did." The court then asked if defendant had any additional complaints about counsel's representation, to which defendant indicated he did not.

¶ 21 The trial court allowed defendant's trial counsel the opportunity to respond to defendant's complaints. Counsel stated he asked defendant what he wanted to do and conveyed the State's offer of 10 years at 85%, which defendant rejected and stated he wanted a jury trial. Counsel asked defendant whether anyone else was present during the altercation, to which defendant indicated there was not. Counsel asked if there was video, to which defendant indicated there was not. Counsel asked if this was a "he said, she said" situation, to which defendant indicated it was. Counsel stated he had a later conversation with defendant about the admissibility of his prior conviction should he testify and advised him it would be bad if the conviction was introduced.

¶ 22 After hearing from both sides, the trial court confirmed defendant's trial counsel was still willing to represent defendant for the remainder of the case and then announced counsel would remain.

¶ 23 The trial court returned to admonishing defendant regarding his right to testify. The

court stated:

"And, now, [defendant], I'm going to go back to where we started, and that is, do you understand that if no evidence is presented on your behalf, first of all, there'll be an instruction given that that's not to be held against you. Do you understand that?

If you don't testify, it's not to be held against you. Do you understand that?" Defendant replied, "Yes." The court confirmed defendant understood the State would be able to cross-examine him and introduce his prior conviction if he testified. The court also confirmed defendant understood it was his decision whether to testify. Defendant stated he did not want to testify, and the court confirmed that decision was voluntary. After defendant made his decision, the court told him it believed the decision was "prudent and understandable." The court also stated, "There will be specific instructions given to the jury regarding the fact that you're not testifying. You have already heard some of that instruction today."

¶ 24        The trial court proceeded with a jury instruction conference. Neither side tendered Illinois Pattern Jury Instructions, Criminal, No. 2.04 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 2.04), which conveys that a defendant's decision not to testify cannot be held against him. The jury was not given this instruction.

¶ 25        The jury found defendant guilty of aggravated domestic battery. Thereafter, the trial court denied defendant's motion for a new trial, sentenced defendant to seven years in DOC, and denied defendant's motion to reconsider the sentence.

¶ 26        This appeal followed.

¶ 27                                     II. ANALYSIS

¶ 28        On appeal, defendant challenges (1) the absence of an instruction to the jury

conveying that his decision not to testify could not be held against him and (2) the adequacy of the inquiry into his *pro se* claim of ineffective assistance of trial counsel. The State, in response, seeks an affirmance of the judgment.

¶ 29 We begin with defendant's challenge to the absence of an instruction to the jury conveying his decision not to testify could not be held against him. Defendant initially argues the trial court erred by not instructing the jury pursuant to IPI Criminal No. 2.04 where he indicated his desire for the jury to be so instructed and the court assured him the jury would be so instructed. Defendant acknowledges he did not raise this issue below but asserts this court should relax the rule of forfeiture and review the issue on the merits because the purported error arose from the trial court's own conduct or, alternatively, review the issue as a matter of second-prong plain error and ineffective assistance of trial counsel. Defendant alternatively argues his trial counsel rendered ineffective assistance by not tendering IPI Criminal No. 2.04.

¶ 30 Our supreme court has repeatedly recognized a "defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Jones*, 2023 IL 127810, ¶ 39; see *People v. Downs*, 2015 IL 117934, ¶ 13; *People v. Patrick*, 233 Ill. 2d 62, 76 (2009); *People v. Herron*, 215 Ill. 2d 167, 175 (2005). This rule encourages a defendant to raise instruction issues before the trial court, allowing the court to correct errors before the instructions are given, and thus disallowing the defendant to obtain a reversal through inaction. *Herron*, 215 Ill. 2d at 175.

¶ 31 Defendant initially, with respect to the purported error of the trial court in not instructing the jury pursuant to IPI Criminal No. 2.04, invites this court to relax the rule of forfeiture and review the issue on the merits because the purported error arose from the trial court's

own conduct. We decline defendant's invitation. While our supreme court has recognized an exception to the forfeiture rule where the basis for the objection is the trial court's own conduct (*People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963)), it has also made clear the application of this exception is appropriate only in "extraordinary circumstances, such as when a trial judge makes inappropriate remarks to a jury [citation] or relies on social commentary, rather than evidence, in sentencing a defendant to death" (*People v. McLaurin*, 235 Ill. 2d 478, 488 (2009)). Defendant does not explain, nor do we find, the circumstances of this case warrant the application of this exception. Defendant had ample opportunity to raise the purported error during trial and in his posttrial motion, which he failed to do.

¶ 32        Defendant also invites this court to review the purported error of the trial court as a matter of second-prong plain error. The plain-error doctrine provides a "narrow and limited exception" to the rule of forfeiture. *People v. Jackson*, 2020 IL 124112, ¶ 81; see *People v. Hartfield*, 2022 IL 126729, ¶¶ 49-50 (stating unpreserved jury instruction errors may be reviewed as a matter of plain error). Under the second prong of the plain-error doctrine, a reviewing court considers whether there has been "a clear or obvious error" and, if so, whether that "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Schoonover*, 2021 IL 124832, ¶ 27. The defendant bears the burden of persuasion in establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43.

¶ 33        Our first step under the plain-error doctrine is to determine whether there has been a clear or obvious error. *People v. Jackson*, 2022 IL 127256, ¶ 21. Defendant has not made such a showing. To begin, a trial court is generally "under no obligation *** to give jury instructions not requested by counsel." *People v. Underwood*, 72 Ill. 2d 124, 129 (1978). Further, with respect to the specific jury instruction at issue, IPI Criminal No. 2.04, the committee notes to that instruction

state it "should be given *only* at the defendant's request." (Emphasis in original.). See *Carter v. Kentucky*, 450 U.S. 288, 300 (1981) ("[T]he Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so."); *People v. Ramirez*, 98 Ill. 2d 439, 450 (1983) ("[A] state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." (Internal quotation marks omitted.)). Defendant's responses when being admonished about his right to testify did not constitute a request that IPI Criminal No. 2.04 be given. The exchange between the court and defendant shows an assumption was made by the court defendant, through his counsel, would tender IPI Criminal No. 2.04 during the jury instruction conference, an assumption which was ultimately proven incorrect. That assumption and the responses thereto do not amount to a request that IPI Criminal No. 2.04 be given. We conclude defendant has not shown the court erred by not instructing the jury with IPI Criminal No. 2.04. We need not proceed further in our analysis under the plain-error doctrine.

¶ 34    And last, defendant invites this court to review the purported error of the trial court as a matter of ineffective assistance based upon trial counsel's failure to object to the court not giving the instruction. Additionally, as an alternative to his argument that the court erred, defendant argues counsel rendered ineffective assistance by not tendering IPI Criminal No. 2.04.

¶ 35    "The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel." *People v. Lewis*, 2022 IL 126705, ¶ 44. To establish ineffective assistance of counsel, a defendant must show *both* (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance of counsel prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); see *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting the *Strickland* standard). "More specifically, a

defendant must show counsel's performance was objectively unreasonable under prevailing professional norms and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.). *People v. Domagala*, 2013 IL 113688, ¶ 36. A court "may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 36          We find there is no reasonable probability, but for trial counsel not objecting to the trial court's not giving IPI Criminal No. 2.04, or but for counsel himself not tendering the instruction, the result of the proceeding would have been different. First, we find the trial court was under no obligation to give the instruction absent a request by defendant to do so. Second, the venirepersons who eventually became members of the jury indicated they understood and accepted the principle defendant's decision not to testify could not be held against him, thereby mitigating the risk the jury would hold defendant's decision not to testify against him. We do not suggest the earlier admonition to the venire is somehow determinative but note the venire accepted the principle. And third, the evidence against defendant was overwhelming. Justice testified defendant was the person who "beat[ ]" her, and that testimony was corroborated by the timeline of events provided by Justice and her mother and by defendant's flight from the scene. After considering the record, we find there is no reasonable probability the result of the proceeding would have been different had trial counsel either (1) objected to the court not giving IPI Criminal No. 2.04 or (2) tendered IPI Criminal No. 2.04. Accordingly, we conclude defendant's trial counsel did not render ineffective assistance.

¶ 37          We turn next to defendant's challenge to the adequacy of the inquiry into his *pro se* claim of ineffective assistance of trial counsel. Defendant argues the trial court erred by not

conducting a neutral and nonadversarial inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. Defendant asserts the court improperly "dismissed the allegations, defended counsel's trial strategy and his representation, in part, on matters outside the record, and solicited confirmation from the State that counsel's advice was correct."

¶ 38        *Krankel* and its progeny establish the procedures a trial court must follow when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel. See *Krankel*, 102 Ill. 2d at 189; *People v. Johnson*, 159 Ill. 2d 97, 126 (1994); *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). These procedures serve " 'the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims,' 'to promote consideration of *pro se* ineffective assistance claims in the trial court,' and 'to limit issues on appeal.' " *Jackson*, 2020 IL 124112, ¶ 95 (quoting *People v. Patrick*, 2011 IL 111666, ¶¶ 39, 41).

¶ 39        Under *Krankel*, a trial court must first conduct an inquiry into the factual bases of the defendant's claim of ineffective assistance. In conducting its inquiry, the court may (1) briefly discuss the claim with the defendant, (2) ask trial counsel to "answer questions and explain the facts and circumstances" relating to the claim, and (3) evaluate the claim based on "its knowledge of *** counsel's performance at trial," as well as "the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79. The inquiry should generally not involve the participation of the State, nor should the court rely upon matters outside the record. *People v. Jolly*, 2014 IL 117142, ¶¶ 31, 46. "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78.

¶ 40        We find the trial court conducted an adequate inquiry into defendant's *pro se* claim

of ineffective assistance of trial counsel. As an initial matter, neither defendant nor the State addresses *when* defendant made his claim—during trial. Our supreme court has stated, "*Krankel* is limited to posttrial motions." *People v. Ayres*, 2017 IL 120071, ¶ 22. In any event, our review shows the court, when presented with defendant's claim, conducted a thorough inquiry of defendant to understand the factual bases for his claim. The court repeatedly asked defendant open-ended question to allow him to elaborate on his claim. In doing so, the court cautioned defendant against interrupting it or risking contempt, which we find did not transform the proceeding into an adversarial one but rather was an appropriate exercise of the court controlling its courtroom. See, *e.g.*, *People v. Cummings*, 2023 IL App (1st) 220520, ¶ 54. The court also, in conducting its inquiry, attempted to alleviate defendant's concerns by explaining counsel's actions. In particular, the court explained why counsel may have advised defendant not to testify—to avoid the introduction of defendant's prior conviction. While the court confirmed with the State it intended to introduce the conviction if defendant testified, this confirmation was unnecessary, and any participation by the State was *de minimis*. See *Jolly*, 2014 IL 117142, ¶ 38. The court further, as part of its inquiry, considered whether counsel spoke with defendant about the plea offer. While the court commented on the general practice of counsel on this issue, the court's comment was ultimately harmless, as defendant, himself, confirmed counsel had discussed the offer with him. In sum, we find the court conducted an adequate inquiry into defendant's claim.

¶ 41　　　　　Before concluding, we would be remiss not to comment on the quality of the briefing provided by defendant's appellate counsel. In particular, we commend counsel for the statement of facts set forth in the opening brief. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). It is concise, neutral, and accurate. As a result, the background section of this decision is largely a recitation of the statement of facts. We thank counsel for the efforts which, in turn, have allowed

us to spend additional time on the legal issues presented in this appeal.

¶ 42                                    III. CONCLUSION

¶ 43            For the reasons stated, we conclude defendant has not established any reversible error with respect to the actions of the trial court or his trial counsel and, therefore, affirm the trial court's judgment.

¶ 44            Affirmed.